IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 23-CR-30012-SPM-1 |
| RICHARD WALKER, | |
| Defendant. | |

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion to Suppress Evidence and memorandum in support filed by Defendant Richard Walker. (Docs. 24, 25). The United States (the "Government") filed a response to the Motion. (Doc. 29). Walker then filed a reply. (Doc. 31). Afterwards the Court ordered briefing on the issue of standing, and both parties submitted supplemental briefs. (Docs. 36, 37, 38). For the reasons set forth below, the Motion is **DENIED**.

BACKGROUND

Walker and the Government agree on a simple set of facts regarding the search and seizure that is the focus of his Motion. In October 2022, Walker failed to appear at the St. Clair County Courthouse and the court issued a bench warrant. (Docs. 25, 25-1, 29). Walker was on monitored release with St. Clair County Probation at the time and removed his ankle monitor. (Doc. 29-2). On October 28, 2022, St. Clair County Officer Xavier Blackburn and other law enforcement, as part of the United States Marshals Great Lakes Regional Fugitive Task Force, were

tasked with the arrest of Walker on the warrant. (Docs. 25, 25-1, 29). Officers assembled around the address where they believed Walker resided at the time, 313 Short Street in Brooklyn, Illinois, a trailer home. (*Id.*). The homeowner, Laverne Shipp, lived there along with her daughter Ramona Paulette, who was Walker's girlfriend, and their minor-aged son. (Docs. 25-1, 29). Officers approached the front door and knocked several times. (Docs. 25, 25-1, 29). Walker's son opened the front door and walked outside. (*Id.*). At the time, he advised officers he was not sure who else might be inside the residence. (Doc. 25). Subsequently, Walker emerged and was taken into custody without incident. (*Id.*). During what was described as a protective sweep while inside the residence, one of the officers lifted the mattress in Walker's son's bedroom and discovered a firearm underneath. (Doc. 29-2). The mattress sat on top of a box spring, which laid on the floor. (Doc. 25-3). The discovering officer informed another officer, who then photographed and seized the firearm. (Doc. 29-2).

A report of the investigation by Blackburn stated that from his experience, "individuals have been known to hide underneath mattresses, beds, tables, behind doors, inside closets, dryers, etc. to evade being arrested." (Doc. 25-1) (cleaned up). In his report of investigation, task force member Ryan Green stated that "[b]ased on training and experience, persons have been known to conceal themselves to avoid law enforcement detection in areas that a person may fit, to include but not limited to under mattresses, in closets, and under couches." (Doc. 29-2) (cleaned up).

Officers did not find other individuals in the home. (*Id.*).

After this search, Shipp and Paulette arrived and Shipp signed a consent form

allowing the officers to conduct a more thorough search of the residence. (Docs. 25, 29 29-1). During the subsequent search, officers located pill capsules filled with powder (later determined to be fentanyl), a bag of empty capsules, a pill press, a pipe, scales, and Walker's credit card in a pile of men's clothing in Paulette's bedroom. (Docs. 25-1, 29). Shipp and Paulette also gave an interview in which Paulette said that Walker stayed at the Short Street home most nights, but not every night. (Doc. 29-4).

During his interview with law enforcement after his arrest, Walker stated that he resided at 152 Washington Avenue in Madison, Illinois. (Doc. 29-3). He also stated that he always slept in the back room with Paulette when he stayed at the Short Street home. (*Id.*).

Afterwards, Shipp signed an affidavit that stated that she consented to a search of her home because officers told her that they found a handgun in the bedroom. (Doc. 25-2).

## LEGAL STANDARD

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights. The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Supreme Court of the United States has explained that "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been

secured by means of an unlawful search and seizure." *Simmons v. U.S.*, 390 U.S. 377, 389 (1968).

"The Supreme Court has consistently held that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *U.S. v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). In other words, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134, (citing *Alderman v. U.S.*, 394 U.S. 165, 174 (1969)).

The Supreme Court has explained that whether a defendant can challenge a search is an issue of substantive Fourth Amendment law. *See Carlisle*, 614 F.3d at 756 (citing *Rakas*, 439 U.S. at 143). That substantive law "protects against warrantless intrusions by the government into areas in which that individual holds a reasonable expectation of privacy." *U.S. v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (citing *U.S. v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)).

The United States Supreme Court has also determined that in certain circumstances, police officers can lawfully conduct a warrantless search. In *Terry v. Ohio*, the Court ruled that "police conduct, necessarily swift action predicated upon the on-the-spot observations of the officer on the beat . . . as a practical matter could not be, subjected to the warrant procedure." 392 U.S. 1, 20 (1968). The Court has recognized that as a precautionary matter and without probable cause or reasonable suspicion, police officers can conduct "protective sweeps" by looking in closets and

other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. However, this sweep must be based on "specific and articulable facts" that lead officers to believe there are individuals on the premises that pose a danger. *Maryland v. Buie,* 494 U.S. 325, 327 (1989).

## ANALYSIS

As an initial matter regarding standing, the Government has provided no case that states that Walker's violation of his house arrest diminished his expectation of privacy in the Short Street home, nor has the Court found such a case. Several years ago, the United States Court of Appeals for the Seventh Circuit specifically declined to answer whether a fugitive hiding from law enforcement has any legitimate expectation of privacy as an overnight guest. *See U.S. v. Procknow*, 784 F.3d 421, 426 (7th Cir. 2015). The Government's argument that Walker was not legitimately on the premises of the Short Street home because of the violation of his house arrest is flawed. Notwithstanding his legal issues, it is clear from Shipp and Paulette's interview that during that time, Walker was there as an invited guest most nights.

Conjunctively, in *Minnesota v. Olson*, the Supreme Court found that overnight guests have a legitimate expectation of privacy in their host's homes. 495 U.S. 91 (1990). In doing so, the Court flatly rejected a multifactor reasonability test proposed by the State of Minnesota and found that because Olson was an "overnight guest" at the invaded dwelling, this was enough to show that he had a legitimate expectation of privacy "that society was prepared to recognize as reasonable." *Id.* at 97. In effect, the Court observed that staying overnight as a guest in another's home

"is a longstanding social custom that serves functions recognized as valuable by society." *Id.* at 98. An overnight guest, in turn, would naturally "seek shelter in another's home precisely because it provides him with privacy . . . not [to] be disturbed by anyone but his host and those his host allows inside." *Id.* at 99. Further, the Court reasoned that society would consider an expectation of privacy reasonable because of one's vulnerability when asleep – which is why we seek out our own home or another private place for shelter (such as a host's home or hotel), rather than a public place, where we cannot monitor our own safety or secure our belongings. *Id.* Additionally, the Court found that the overnight guest generally has some measure of control over the premises (i.e., the host will not usually confine a guest to one particular area of the house), and that the host will usually not admit someone into his home who wants to see or meet with the guest over the guest's objection. *Id.* In other words, the Court believed that hosts will more likely than not respect the privacy interests of their overnight guests. *Id.* at 100. Thus, reasonableness and even subjective expectation of privacy appear to be absolute when it comes to overnight guests with permission to stay. In this case, Walker was clearly a frequent overnight guest at the Short Street house. The night before the search, he had stayed overnight there. Therefore, Walker has standing to challenge the warrantless search.

Walker argued that there were no exigent circumstances to justify the search underneath the mattress in Walker's son's bedroom. The Government argued that the search was within the proper scope of a protective sweep.

In *Maryland v. Buie*, the Supreme Court articulated that police officers could "assure themselves" that the premises of the arrest was not harboring other

dangerous individuals by conducting a protective search. Moreover, "officers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area." *U.S. v. Burrows,* 48 F.3d 1011, 1013 (7th Cir. 1995).

Multiple cases from the Seventh Circuit have given police officers considerable autonomy in conducting protective sweeps when they are made aware of the presence of others on the premises. In *U.S. v. Contreras*, the Seventh Circuit upheld the District Court's determination that the presence of another person justified the search. 820 F.3d 255, 269 (7th Cir. 2016) ("[h]aving heard the presence of another person, the police were entitled to sweep the house for their own protection."). In *U.S. v. Henderson*, police officers, after detaining an individual, "did not know how many occupants or what the occupants were doing inside the house;" as a result, the Court found that their search was considered lawful. 748 F.3d at 792. Even so, that does not end the inquiry. *Buie* limits the scope of a protective sweep to a "cursory" inspection of spaces where individuals may be found and must last no longer than is necessary to dispel potential danger; it does not allow for a full search of the premises. 494 U.S. at 326. In determining whether the search was of a limited scope, courts should analyze "the configuration of the dwelling, the general surroundings, and the opportunities for ambush." *U.S. v. Starnes*, 741 F.3d 804, 808 (7th Cir. 2013). "An ambush in a confined setting of unknown configuration is just such a situation in which an officer might need to perform a protective sweep." *Id.* (citing *Buie,* 494 U.S. at 333; *U.S. v. Tapia,* 610 F.3d 505, 511 (7th Cir. 2010)).

In this case, the officers had information that there were others that could be

on the premises in a confined trailer home. As a result, the action of the protective sweep into the bedroom was constitutional.[1]

Officers found a firearm underneath the mattress in Walker's son's bedroom in the trailer home. The Government argued that it is possible for an individual to hide underneath a mattress in the bedroom. The inquiry of whether a space can hold a person is judged from the perspective of an objectively reasonable officer at the time of the search. *See Burrows*, 48 F.3d at 1015. While a close question, there is evidence to support reasonable suspicion in this case. The officers involved in the search stated that they believed that a person could hide underneath a mattress at the time of the search and it appears from the photographs in the record that, although awkward positioning would exist, an attack could be launched from between the mattress and the box spring. Once the firearm was found, it could be seized at bare minimum to ensure the officers' safety while securing the rest of the home.

Regardless of how one might view the protective sweep, the seizure of the firearm falls within the attenuated exception to exclusion. Generally, "[w]hen the government obtains evidence in violation of an individual's Fourth Amendment

---

[1] Although not argued by the Government, Walker's suggestion that the bedroom where the firearm was found was not "immediately adjoining the place of arrest" is dubious. "Although the Seventh Circuit has not directly addressed the meaning of 'immediately adjoining' in the context of the confined quarters of a small house or apartment, in *dicta* it characterized *Buie* as allowing police to 'walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within,' and that the 'officers need not demonstrate any danger; they may simply look as a precaution.'" *U.S. v. Brookshire*, 2009 WL 57530, at *6 (N.D. Ind. Jan. 8, 2009) (quoting *U.S. v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995)). Here, Walker was arrested immediately outside of a trailer home, which could be characterized as small. This may, on its own justify the sweep extending into Walker's son's bedroom and under the mattress.

rights, the remedy is [] the exclusion of that evidence—and evidence that is the fruit of the illegal search or seizure—at trial." *U.S. v. McGill*, 8 F.4th 617, 624 (7th Cir. 2021) (citing *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016)). That said, Shipp subsequently consented to a search of the entire home. Under certain circumstances, the exclusionary rule may not apply. Confusingly, Walker first teed up analysis of the inevitable discovery exception to exclusion before pivoting. Walker did not dispute that Shipp had authority to give consent to the spaces searched in this case and he conceded that Shipp's consent was voluntary. Instead, Walker tellingly argued that, even if voluntary, Shipp's consent was tainted by an initial, illegal entry. This is the attenuated exception to exclusion.

"Whether consent was tainted is a question of attenuation—was the voluntary consent 'obtained by exploitation of' the preceding Fourth Amendment violation . . . 'or instead by means *sufficiently distinguishable* to be purged of the primary taint?'" *U.S. v. Davis*, 44 F.4th 685, 689 (7th Cir. 2022) (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975); *U.S. v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003)). The factors relevant to determining whether the consent was tainted are "(1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Robles-Ortega*, 348 F.3d at 681 (citing *Brown v. Illinois*, 422 U.S. at 603-04).

In its response regarding temporal proximity, the Government stated that Shipp did not arrive on the scene until after the officers' entry and completion of the protective sweep. Walker did not address this factor in his memorandum, nor did he

Page 9 of 11

dispute the assessment in his reply.

The next two factors did cause dispute amongst the respective parties. Touching on intervening circumstances, the Government alleged that "the relevant intervening circumstance was Shipp's arrival after the sweep was completed and her subsequent consent to search." (Doc. 29, p. 14). Walker cited *U.S. v. Liss*, in which the Seventh Circuit warned that exclusion would be appropriate if the police were to "exploit illegally-obtained knowledge to coerce an individual into providing consent." 103 F.3d 617 (7th Cir. 1997). The Court opined that this danger "would seem to loom larger where the illegal search and subsequent consent search were of the same location." *Id.* at 621. However, "the highly fact-intensive nature of the attenuation inquiry precludes sweeping generalizations about the circumstances that will be relevant for any particular case." *U.S. v. Conrad*, 673 F.3d 728, 734 (7th Cir. 2012). Here, illegally obtained knowledge given to Shipp weighs in favor of exclusion, but Shipp was not present during the search of her home – she arrived afterwards – and she was in the comfort of her own home when deciding whether to consent. These last two factors weigh in favor of a finding of attenuation.

Concerning flagrancy of the official misconduct, the most important factor, the Government asserted that the officers had a valid arrest warrant, conducted a protective sweep incident to an undisputedly lawful arrest, and did not act in bad faith. (Doc. 29, p. 15). Where police made a mistake during a search but the record does not support an inference of bad faith, the violation is not flagrant. *Utah v. Strieff,* 579 U.S. 232, 243 (2016). This factor also favors a finding of attenuation. Here, officers had a valid arrest warrant and conducted a protective sweep incident

to an undisputedly lawful arrest. There is no indication that they engaged in overbearing tactics with Walker during his arrest that might reveal evidence that they could not otherwise obtain, nor does the evidence suggest that they tossed the whole trailer home looking for evidence.

Consequently, Shipp's consent, which also yielded the contraband in Paulette's bedroom, provided independent legal justification to uphold the search and seizure.

## CONCLUSION

Accordingly, the warrantless search and seizure conducted in this case lawful. Defendant Richard Walker's Motion to Suppress Evidence (Doc. 24) is **DENIED**.

**IT IS SO ORDERED.**

DATED:   December 1, 2023

s/ <i>Stephen P. McGlynn</i>  
**STEPHEN P. McGLYNN**  
**U.S. District Judge**