## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 23-CR-30012-SPM |
| RICHARD WALKER, | |
| Defendant. | |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

This matter is before the Court on reconsideration of Defendant Richard Walker's Motion to Suppress Evidence. (Doc. 24). In addition, pending before this Court is a Motion to Bar Waived Argument on Remand filed by Defendant Walker. (Doc. 72). Having fully considered the issues presented, the Motion to Suppress (Doc. 24) is **GRANTED**; the Motion to Bar Waived Argument on Remand (Doc. 72) is **DENIED as moot**.

### FACTUAL BACKGROUND

Defendant's Motion to Suppress arises from two searches conducted at a modular trailer home on October 28, 2022, where Defendant Richard Walker had stayed the night before. On October 27, 2022, St. Clair County Circuit Court issued a bench warrant for Walker's arrest following his failure to appear on underlying state firearm and retail theft charges.[1] (Docs. 25, 29). At the time, Walker was on

---

[1] The factual background is largely developed from reports prepared by St. Clair County Sheriff's Department Investigator Xavier Blackburn (Doc. 25), and Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Zachary Green (Doc. 29).

monitored release with St. Clair County Probation and had purportedly removed his ankle monitor. (Doc. 29). On October 28, 2022, law enforcement officers including St. Clair County Sheriff's Department Investigator Xavier Blackburn; federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Zachary Green; and officers with the United States Marshal Service Great Lakes Regional Fugitive Task Force ("Great Lakes Fugitive Task Force") executed the warrant for Walker's arrest. (Doc. 25; *see* Doc. 29; *see also* Doc. 29, Ex. 2). Officers arrived at a modular trailer home located at 313 Short Street in Brooklyn, Illinois (hereinafter "Short Street Property"), acting on information that Walker had been residing there. (Doc. 25, p. 2; Doc. 29; *see* Doc. 29, Ex. 2). The Short Street property was owned by Laverne Shipp, who lived there with her daughter, Ramona Paulette (who was Walker's girlfriend), and the minor son of Walker and Paulette, Walker, Jr. (Doc. 25; Doc. 29; *see* Doc. 29, Ex. 2).

It is unclear at precisely what time officers arrived to execute the warrant. Upon their arrival, law enforcement officers established a perimeter around the residence and then knocked and announced their presence. (Doc. 29, Ex. 2). Walker, Jr. answered the door and walked outside to speak with the officers. (Doc. 25, Ex. 1). Blackburn and other officers asked Walker, Jr. whether anyone else was in the residence, to which he responded he was not sure who was in the residence or not. (*Id.*). Blackburn and other officers continued to announce their presence while at the door and yelled demands into the home for Walker to come out and step outside. (Doc. 25, Ex. 1; Doc. 29, Ex. 2). Walker then appeared from within the home as if he had

just awoken, walked to the door with his hands up, and exited the residence. (Doc. 25, Ex. 1; Doc. 29, Ex. 2). Officers arrested Walker "without incident." (Doc. 25, Ex. 1; Doc. 29, Ex. 2). At some point following the arrest, Walker was transported to St. Clair County Sheriff's Department Jail. (*Id.*; Doc. 25, Ex. 1).

Officers with the Great Lakes Fugitive Task Force then entered the Short Street Property to conduct a "protective sweep" wherein they purportedly searched for other individuals within the residence. (Doc. 25, Ex. 1; Doc. 29, Ex. 2). Officers first entered the bedroom of Walker, Jr. (the first bedroom once inside the residence) and lifted the mattress, discovering a firearm concealed between the mattress and box spring. (Doc. 25, Ex. 1; Doc. 29, Ex. 2). ATF Special Agent Green photographed the firearm where it was discovered and seized it. (Doc. 29, Ex. 2). No other individuals were located within the home. (*Id.*).

 Following the description of Walker's arrest and the protective sweep of the home, Officer Blackburn states in his report that the owner of the home, Shipp, was contacted. (Doc. 25, Ex. 1). According to Blackburn's report, "[S]oon after Shipp, Walker's girlfriend-child's mother Paulette had been notified and arrived at the address." (*Id.*). Blackburn states that "Shipp, after offices advised her of the item found consented to an audio, video witness statement interview," and, prior to that interview, she had "signed a consent to search form," expressing her apparent consent to a search of the Short Street property.[2] (*Id.*). Green similarly describes in his report, following the description of the recovery of the firearm, that "While on the scene, the

---

[2] Special Agent Green attached a copy of the consent to search form to his report, which contains Shipp's signature. (Doc. 29, Ex. 1).

owner of the residence, La Verne Shipp, arrived followed by Ramona Paulette." (Doc.
29, Ex. 2). Blackburn and Green spoke with Paulette, who informed officers that she
and Walker were the parents of the minor child who answered the door upon their
arrival. (*Id.*). Paulette advised that Walker had arrived the previous night and stayed
at the residence with her. (*Id.*). Officers learned that Paulette owned a firearm, which
was located in a locked box in her bedroom she shared with Walker and to which only
Paulette had access. (*Id.*). Paulette consented to allowing law enforcement to view the
firearm, and entered the residence with Green, retrieved the locked box from her
bedroom, and showed it to Green. (*Id.*). Green then writes that he advised Paulette
of the firearm discovered under Walker, Jr.'s mattress, to which she responded by
appearing upset. (*Id.*). Green writes that it was Officer Blackburn who requested and
received written consent to search the residence from Shipp. (*Id.*).

Officers subsequently entered the home and searched the bedroom Paulette
shared with Walker, where they discovered a Crown Royal bag containing suspected
marijuana, a glass smoking pipe, and VISA cards belonging to Walker's mother. (*Id.*).
Under the bag was a zippered bag containing clear bags of empty capsules, two
grinders, a pill press, empty bottles, scales, and clear bags. (*Id.*; *see* Doc. 25, Ex. 1).
Next to the bags were male clothing items, where a clear knotted bag with capsules,
suspected to be fentanyl, was located between pieces of clothing. (Doc. 29, Ex. 2).
Green then showed Paulette where in the bedroom the items were located, and she
confirmed the clothing belonged to Walker. (*Id.*).

Following the search, and just before 10:00 AM, officers recorded a videotaped

interview of Shipp and Paulette. (*See* Doc. 29, Ex. 3, 4). Paulette, when questioned by law enforcement, informed them that she had never seen Walker with a firearm, she was unfamiliar with the firearm discovered under her son's mattress, and that she was not aware of any other firearms in the residence aside from her own. (Doc. 25, Ex. 1; *see* Doc. 29, Ex. 3). She further advised, when questioned, that Walker arrived late the preceding night, around approximately 11:30 PM or 12:00 AM; that she was not sure how he arrived and that he does not have his own vehicle; and that he stays in the bedroom he shares with Paulette and where drug evidence was discovered. (Doc. 25, Ex. 1; *see* Doc. 29, Ex. 3). Paulette and Shipp informed the officers, when asked, that the drug evidence discovered did not belong to them, and Paulette stated that she did not believe she had noticed signs that Walker had been dealing drugs. (Doc. 25, Ex. 1; *see* Doc. 29, Ex. 3).

On February 24, 2024, a grand jury in the Southern District of Illinois returned an Indictment charging Walker with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count I) and one count of possession with intent to distribute a controlled substance (fentanyl) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count II). (Doc. 1). On March 24, 2024, the United States filed the operative Superseding Indictment alleging the same two Counts against Walker. (Doc. 17). On June 5, 2023, Defendant Walker filed his Motion to Suppress and a Sealed Memorandum in Support, seeking to suppress all evidence against Defendant on the basis that it was unlawfully obtained during the search of the modular trailer home where Defendant was initially arrested on October 28, 2022. (Docs. 24, 25). The

Government filed its Response on June 27, 2023. (Doc. 29).

On December 1, 2023, this Court denied Defendant Walker's Motion to Suppress. (Doc. 42). In its written Order, this Court found, in relevant part, that, pursuant to *Maryland v. Buie*, 494 U.S. 325 (1989), and its progeny, the officers had conducted a lawful protective sweep of the Short Street Property following the arrest of Walker. (*See* Doc. 42); *see also United States v. Walker*, 704 F. Supp. 3d 866, 871–72 (S.D. Ill. Dec. 1, 2023). The officers, acting on "information that there were others that could be on the premises in a confined trailer home," acted within the scope of the Constitution when they lifted the mattress in Walker, Jr.'s bedroom and discovered the firearm. (Doc. 42, p. 8); *Walker*, 704 F. Supp. 3d at 872. The Court reasoned that "[t]he officers involved in the search stated that they believed that a person could hide underneath a mattress," and that "although awkward positioning would exist, an attack could be launched from between the mattress and box spring." (Doc. 42, p. 8); *Walker*, 704 F. Supp. 3d at 872. Even if the protective sweep had been unlawful, this Court continued, the seizure of the firearm would still fall within the attenuation exception to the exclusionary rule. (Doc. 42, p. 9); *Walker*, 704 F. Supp. 3d at 872. Officers had obtained the consent of the owner of the home, Shipp, to search the premises, which was sufficiently attenuated from the unlawful conduct of the protective sweep such that it provided independent legal justification to uphold the search and seizure. (Doc. 42, pp. 10–11); *Walker*, 704 F. Supp. 3d at 873.

On December 18, 2023, Walker pleaded guilty to Counts I and II of the Superseding Indictment (Doc. 45), and on March 20, 2024, he was sentenced to a term

of imprisonment of 51 months as to each count, to be served concurrently.[3] (Doc. 53).

On April 3, 2024, Walker notified this Court of his appeal to the U.S. Court of Appeals for the Seventh Circuit. (Doc. 58). On July 17, 2025, the Seventh Circuit issued its opinion reversing this Court's denial of Walker's Motion to Suppress and remanding the case for further consideration of the issues. (Doc. 66, Ex. 1); *see United States v. Walker*, 143 F.4th 899 (7th Cir. 2025). The Circuit Court concluded that the warrantless search of Shipp's residence, during which officers discovered and seized a firearm in Walker, Jr.'s bedroom, was not reasonable under the Fourth Amendment. (Doc. 66, Ex. 1, p. 10); *Walker*, 143 F.4th at 898. The Circuit Court held that, even if the officers conducting the sweet had sufficiently articulable facts to justify initiating a protective sweep, they exceeded its lawful scope when they lifted the mattress in the son's bedroom. (Doc. 66, Ex. 1, p. 10); *Walker*, 143 F.4th at 898. The Circuit Court held that here, the United States "failed to identify anything in the record to indicate that the officers here had reason to believe the area between the mattress and box spring had been hollowed out such that lifting the mattress would be 'necessary to dispel the reasonable suspicion of danger.'" (Doc. 66, Ex. 1, pp. 10–11 (quoting *Buie*, 494 U.S. at 335–36)); *Walker*, 143 F.4th at 899. Thus, upon finding that the protective sweep violated the Fourth Amendment, the Circuit Court next turned to the question whether any exceptions applied such that exclusion of the evidence would not be required pursuant to the exclusionary rule. (Doc. 66, Ex. 1, p.

---

[3] Walker was additionally sentenced to a term of three years of Supervised Released as to Counts I and II, to run concurrently, as well as a monetary fine of $500.00 and a special assessment of $200.00. (Doc. 53).

13); *Walker*, 143 F.4th at 899.

First, in applying the good-faith exception to the rule, the Seventh Circuit held that the Government failed to carry its burden to show that officers acted in objective good faith when lifting the mattress in Walker, Jr.'s bedroom. (Doc. 66, Ex. 1, p. 15); *Walker*, 143 F.4th at 900. Here, the Government failed to establish that the officers reasonably relied on binding precedent when they lifted a mattress during a protective sweep when they lacked particularized suspicion that a dangerous person was hiding, and was able to hide, under the mattress. (Doc. 66, Ex. 1, p. 15); *Walker*, 143 F.4th at 900. Next, the Circuit Court evaluated whether the attenuation exception may prevent the exclusion of the firearm evidence and held that this Court erred in applying this exception to conclude that the firearm may be admissible despite the unlawful protective sweep leading to its discovery. (Doc. 66, Ex. 1, p. 16); *Walker*, 143 F.4th at 900–901. The Circuit Court further held that this Court's conclusion that "Shipp's consent served as an intervening circumstance between the unlawful conduct (*i.e.*, the protective sweep) and the evidence seized (*i.e.*, the firearm)" was flawed because Shipp's subsequent consent could not have served as an intervening circumstance or the means through which the government could have lawfully obtained the firearm. (Doc. 66, Ex. 1, p. 17); *Walker*, 143 F.4th at 901. Because the firearm was obtained during the initial unlawful search, not during the second, purportedly consensual search, the "inevitable discovery doctrine was the correct tool for the job." (Doc. 66, Ex. 1, p. 17); *Walker*, 143 F.4th at 901 (citation modified) (citing *United States v. Cooper*, 24 F.4th 1086, 1095–96 (7th Cir. 2022)).

Here, the Seventh Circuit held that, because this Court had not evaluated this
exception to the rule nor rendered any factual findings to an assessment of whether
this exception applied, it was remanding the case to this Court to "'examine the
circumstances as they existed just before the protective sweep to determine what
would have happened had the protective sweep never occurred.'" (Doc. 66, Ex. 1, p.
19 (quoting *United States v. Cooper*, 24 F.4th 1086, 1096 (7th Cir. 2022)); *Walker*, 143
F.4th at 902. Finally, in concluding its analysis, the Circuit Court additionally
instructed this Court to, on remand, determine anew whether Shipp's consent
justified the second search of the home. (Doc. 66, Ex. 1, p. 20); *Walker*, 143 F.4th at
902.

On August 8, 2025, the Notice of Issuance of Mandate was filed in this Court.
(Doc. 66). The parties appeared for a Status Conference held on August 28, 2025, and
this Court subsequently ordered the parties to submit supplemental briefing limited
to resolving the outstanding issues as set forth by the Seventh Circuit in its opinion:
(1) whether the inevitable discovery exception to the exclusionary rule applies to the
search and seizure of the firearm; and (2) whether Laverne Shipp's consent provided
independent legal justification to uphold the search and seizure of the controlled
substance contraband in Ramona Paulette's bedroom. (Doc. 69). The Court scheduled
an Evidentiary Hearing for the matter for October 9, 2025. (*See id.*). Walker objected
to the hearing. (Doc. 71). On September 8, 2025, Defendant filed a Motion to Bar
Waived Argument on Remand, arguing that the Government should be barred from
arguing in its supplemental brief that the firearm would have inevitably been

discovered because it previously failed to present evidence or make argument on part of the legal analysis on that issue. (Doc. 72).

On October 1, 2025, the United States filed a Motion to Dismiss Count I of the Superseding Indictment. (Doc. 74). The Government, as a result, stated in Response to Walker's Motion to Bar Waived Argument on Remand that, should the Government's Motion to Dismiss be granted, argument as to the application of the inevitable discovery doctrine to the search and seizure of the firearm would be moot in light of the firearm charge being dismissed. (Doc. 75). In addition, the Government filed its Supplemental Brief on October 1 (Doc. 77) and also waived its right to present evidence at the Evidentiary Hearing on October 9, 2025. (Doc. 76). Defendant Walker filed his Supplemental Brief on October 2, 2025. (Doc. 78). In light of the parties having informed the Court they did not wish to present additional evidence nor move forward with the hearing, the Court cancelled the Evidentiary Hearing. (Doc. 79).

## LEGAL STANDARD

The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The very core of the Fourth Amendment guarantee is "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Caniglia v. Strom*, 593 U.S. 194, 197−98 (2021) (citing *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "From a constitutional standpoint, there's no place like home." *United States v. Corder*, No. 21-CR-114-1, 2023 WL 2539030, at \*5 (N.D. Ill. Mar. 16, 2023). A warrantless search of a home is presumptively unreasonable

under the Fourth Amendment; accordingly, the government has the burden to show, by a preponderance of the evidence, that the search was reasonable under a valid exception to the warrant requirement. *United States v. Davis*, 44 F.4th 685, 688 (7th Cir. 2022) (citing *United States v. McGill*, 8 F.4th 617, 621 (7th Cir. 2021); *see also Riley v. California*, 573 U.S. 373, 382 (2014); *United States v. Basinki*, 226 F.3d 829, 833 (7th Cir. 2000)).

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights. The Supreme Court has explained that "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). "[W]hen the government obtains evidence in violation of an individual's Fourth Amendment rights, the remedy is generally the exclusion of that evidence—and evidence that is the fruit of the illegal search or seizure—at trial." *McGill*, 8 F.4th at 624 (citing *Utah v. Strieff*, 579 U.S. 232, 237–39 (2016)). "But this rule does not apply automatically. Rather, it applies 'only . . . where its deterrence benefits outweigh its substantial social costs,' and certain exceptions to the rule have arisen accordingly." *Id.* (citing *Strieff*, 579 U.S. at 237–39). The Fourth Amendment exclusionary rule extends to both direct and indirect products of the unconstitutional conduct, and therefore, "in determining whether evidence is tainted by a prior illegality, we must determine whether the evidence was come at by

exploitation of the initially illegality or instead by means sufficiently distinguishable
to be purged of the primary taint." *United States v. Robeles-Ortega*, 348 F.3d 679, 681
(7th Cir. 2003) (citation modified) (quoting *United States v. Valencia*, 913 F.2d 378,
382 (7th Cir. 1990)).

One such instance where this attenuation analysis is required is where law
enforcement initially conduct an unlawful search of a home, which is then followed
by officers obtaining the individual's consent to search the home. In that case,
"[w]here the search following the illegal entry is justified based on alleged consent,
courts must determine whether that consent was voluntary, and in addition the court
must determine whether the illegal entry tainted that consent." *Id.* It is the
Government's burden to prove voluntary consent was given by a preponderance of
the evidence standard. *See United States v. Hernandez-Pineda*, No. 25-CR-64, 2025
WL 2438683, at *5 (E.D. Wis. Aug. 25, 2025) (citing *Schneckloth v. Bustamonte*, 412
U.S. 218, 219 (1973)). In determining whether consent justifies a warrantless search,
the court looks at whether the consenting individual had authority to consent to the
searched spaces and whether the consent was voluntarily given, rather than the
product of duress or coercion. *Davis*, 44 F.4th at 688 (citing *United States v. Correa*,
908 F.3d 208, 221–22 (7th Cir. 2018)); *see also United States v. Coleman*, 154 F.4th
558, 561 (7th Cir. 2025) citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)
(stating that for consent to be valid, it must be given freely and voluntarily); *United
States v. Jones*, 22 F.4th 667, 676–77 (7th Cir. 2022); *United States v. Contreras*, 820
F.3d 255, 269 (7th Cir. 2016).

Determining whether consent to search was given voluntarily requires a court to analyze the totality of the circumstances. *Coleman*, 154 F.4th at 561 (citing *United States v. Han*, 205 F.4th 986, 991 (7th Cir. 2024)). Pertinent factors to this analysis include: (1) the age, intelligence, and education of the person who gave consent; (2) whether she was advised of their constitutional rights; (3) how long she was detained before giving consent; (4) whether she consented immediately or only after repeated requests by authorities; (5) whether physical coercion was used; and (6) whether she was in police custody at the time she gave consent. *Correa*, 908 F.3d at 222 (citing *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004)). However, "'a determination of voluntariness does not ride on the presence or absence of a single controlling factor,'" rather, a district court must take careful consideration of all of the surrounding circumstances. *United States v. Johnson*, 495 F.3d 536, 541−42 (7th Cir. 2007) (quoting *United States v. LaGrone*, 43 F.3d 332, 334 (7th Cir. 1994)).

Where voluntary consent is established, the analysis turns to whether that consent was sufficiently attenuated from the initial Fourth Amendment violation. *See Davis*, 44 F.4th at 689 (citing *Robles-Ortega*, 348 F.3d t 681). In analyzing whether the consent is sufficiently attenuated from the prior unconstitutional action, the inquiry focuses on the following factors: (1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, in particular, (3) the purpose and flagrancy of the official misconduct. *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603−604 (1975)). "Whether consent was tainted is a question of attenuation." *Corder*, 2023 WL 2539030, at *11 (citing *Davis*, 44 F.4th at 689; *United*

*States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012)). The third factor is considered the most important factor because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct. *See Conrad*, 673 F.3d at 733; *see also United States v. Green*, 111 F.3d 515, 532 (7th Cir. 1997). "This factor considers both the conduct before and after the constitutional violation." *Conrad*, 673 F.3d at 733 (citing *Reed*, 349 F.3d at 464−65). Bad faith cuts against attenuation, as does "actions that were otherwise coercive or calculated to cause surprise, fright, or confusion, and actions undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence." *Id.* (citing *Reed*, 349 F.3d at 465); *see Green*, 111 F.3d at 523 ("Because the primary purpose of the exclusionary rule is to discourage police misconduct, application of the rule does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights.") (citing *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990).

## ANALYSIS

As an initial matter, this Court notes that the issue of whether Walker has standing to assert Fourth Amendment challenges to the searches and seizure of evidence at the Short Street Property has already been litigated. Both this Court and the Seventh Circuit concluded that Walker did, in fact, have a legitimate expectation of privacy in that residence, and thus standing to bring the Motion to Suppress. (Doc. 66, Ex. 1, p. 7); *Walker*, 143 F.4th at 896. As such, this Court will not revisit the

Fourth Amendment standing analysis.

In addition, this Court notes that, in its opinion, the Seventh Circuit indicated this Court must visit the following questions: (1) whether the inevitable discovery exception to the exclusionary rule applies to the search and seizure of the firearm found under Walker, Jr.'s bedroom; and (2) whether Laverne Shipp's consent provided independent legal justification to uphold the search and seizure of the controlled substance contraband in Ramona Paulette's bedroom. (Doc. 66, Ex. 1, p. 18−19); *Walker*, 143 F.4th at 902. Prior to filing its Supplemental Brief (Doc. 77), the United States moved to dismiss Count I of the Superseding Indictment, the felon in possession of a firearm charge. (Doc. 74). Thus, as to the first issue regarding inevitable discovery of the firearm, the Court finds this argument has been abandoned by the Government and no further analysis as to suppression of the firearm is required. Accordingly, Defendant's Motion to Bar Waived Argument on Remand shall be denied as moot. (Doc. 72). The Court thus begins with the primary analysis required here: whether Laverne Shipp's consent served as an independent justification for the second warrantless search of the Short Street Property wherein the drug evidence was seized.

Defendant Walker argued in both his original Motion to Suppress and Memorandum in Support (Docs. 24, 25) and in his Supplemental Brief (Doc. 78) that evidence of the drugs discovered during the second search of the Short Street Property should be suppressed because the search violated his Fourth Amendment rights. First, Walker argues suppression is appropriate because Laverne Shipp did

not voluntarily consent to the search of her home. (*Id.*, p. 2). Second, even if her consent was voluntary, Walker argues that her consent was tainted by the illegal protective sweep such that it must be suppressed. (*Id.*, p. 3). Having raised challenges to the drug evidence, it is now the burden of the Government to prove the evidence was lawfully obtained. *Davis*, 44 F.4th at 688; *see Riley*, 573 U.S. at 382.

We begin with the issue of whether Laverne Shipp's consent was voluntary. In his Supplemental Brief, filed on October 2, 2025, Walker argues that Shipp's consent was coerced because law enforcement told Shipp and Paulette about the seized firearm before asking for Shipp's consent. (Doc. 78, pp. 2–3). Walker argues that officers informed her of the fruits of their initial search because "[t]hey knew it would influence the likelihood that she would consent," thus exploiting their knowledge of the illegally obtained firearm. (*Id.*, p. 3). Moreover, he argues that the officers were clearly seeking consent to search an area they had already searched, giving Shipp no reason to withhold her consent. (*Id.*).

In its Supplemental Brief, filed on October 1, 2025 (one day prior to Walker's filing), the Government argues that "Defendant has not challenged the voluntariness of Shipp's consent so the only question that remains is whether the consent was tainted by the earlier protective sweep."[4] (Doc. 77, p. 4). Indeed, in his original Motion to Suppress and Memorandum in Support (Docs. 24, 25), filed on June 5, 2023, Walker argued that "voluntariness of the consent is only the first step," and Shipp's

---

[4] In this Court's Order establishing the parameters of supplemental briefing in this case, the parties were ordered to submit briefs no longer than 15 pages in length and reply briefs were prohibited; the deadline for filing supplemental briefs was October 2, 2025. (Doc. 69).

consent could not serve as an independent legal justification for the search because it was tainted by the initial unlawful search and seizure of the property. (Doc. 25, p. 8). In its Response to Walker's Motion to Suppress, which it filed on June 27, 2023, the United States argued that "[a]ssuming, for the sake of argument, that the officer's entry was illegal," Shipp's "voluntary consent was untainted by the illegal entry." (Doc. 29, p. 14). Thus, it appears to this Court that, prior to Defendant's Supplemental Brief, neither party had substantively addressed the discrete issue of whether Laverne Shipp *voluntarily consented* to the second search of her home.

This Court finds that Walker's argument that Shipp's consent was "involuntary" because it was obtained by means of informing her of the fruits of the illegal protective sweep conflates consent with the attenuation doctrine. "Whether consent was tainted is a question of attenuation." *Corder*, 2023 WL 2539030 at *11 (citing *Davis*, 44 F.4th at 689). The question of voluntariness turns on an analysis of the totality of the circumstances, including the following factors: (1) the age, intelligence, and education of the person who gave consent; (2) whether she was advised of their constitutional rights; (3) how long she was detained before giving consent; (4) whether she consented immediately or only after repeated requests by authorities; (5) whether physical coercion was used; and (6) whether she was in police custody at the time she gave consent. *See Coleman*, 2025 WL 2837974 at *3 (citing *Han*, 205 F.4th at 991); *Correa*, 908 F.3d at 222 (citing *Cellitti*, 387 F.3d at 622). The presence of other forms of coercion, including through law enforcement tactics like deception, fraud, or trickery, may also render consent involuntary. *See Hernandez-*

*Pineda*, 2025 WL 2438683, at *5; *see also Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 591−92 (1st Cir. 2019). Consent elicited by law enforcement officers presenting themselves as such, but nevertheless lying about their authority or the purpose and scope of their investigation, are particularly troublesome because citizens will respond to law enforcement with a sense of obligation and presumption of trustworthiness. *See Hernandez-Pineda*, 2025 WL 2438683 at *6 (citing *Pagan-Gonzalez*, 919 F.3d at 592). As such, courts have found otherwise facially consensual searches to be invalid where that consent was elicited through lies regarding the nature or scope of their investigations. *Id.* (citing *Pagan-Gonzalez*, 919 F.3d at 592).

One type of deception courts have found have an impermissibly coercive effect is where officers falsely present an urgent need for action, including in circumstances such as where a defendant was led to believe there was a life-threatening emergency by law enforcement agents seeking consent.[5] *Id.* (citing *United States v. Giraldo*, 743 F. Supp. 152 (E.D.N.Y. 1990)). In *Hernandez-Pineda*, the district court found that defendant's consent was not voluntary given when he, in addition to his language barrier in speaking with the officers and the fact he was detained for 10 minutes without being advised of his constitutional rights, had been influenced by the officers' insistence that they had to search his apartment to verify that a missing child was not there. 2025 WL 2438683 at *7. By creating a ruse in which officers repeatedly told him they had to check his apartment and that it was their job to do so, as opposed

---

[5] The other type, less relevant to the facts of this case, is where consent to search is obtained by officers who falsely claim they have a warrant or otherwise claim authority they lack. *See Hernandez-Pineda*, 2025 WL 2438683 at *6 (citing *Pagan-Gonzalez*, 919 F.3d at 592; *Bumper*, 391 U.S. at 550).

to asking for his consent, the court found that Hernandez-Pineda was under the impression that the search of the apartment was not up to him. *Id.* In *Pagan-Gonzalez*, the First Circuit held that consent obtained when roughly ten FBI agents appeared at defendant's door with the alarming news that computers in Washington, D.C., were receiving signals or viruses from defendant's location (a fabricated emergency) rendered the consent involuntary. 919 F.3d at 597.

Turning to the present matter, Walker has not previously argued (either at any point prior in the litigation or in his Supplemental Brief) that any of the facts of this case, analyzed in accordance with the settled case law and relevant factors for determining the voluntariness of consent, demonstrate that Shipp's consent was not voluntarily given. In fact, upon an examination of the record, this Court does not find any facts to support a conclusion that Shipp's consent was not voluntarily obtained. The facts here demonstrate that Shipp was not detained by law enforcement nor in custody when police sought her consent to search her home. *See Correa*, 908 F.3d at 222 (citing *Cellitti*, 387 F.3d at 622). Shipp was not only advised of her right to decline the search, but officers took the time and procedural step of providing her a written form for her to review and sign that clearly stated she had the right to refuse and was foregoing the opportunity to exercise that right. *See id*; (*see* Doc. 29, Ex. 1). There are also no facts demonstrating any physical force or threats of physical force on behalf of law enforcement. *See Correa*, 908 F.3d at 222. Nor does this Court find that Shipp was coerced by any fraud or deception. *See Hernandez-Pineda*, 2025 WL 2438683 at *5 (citing *Pagan-Gonzalez*, 919 F.3d at 591−92). The fact that officers with the Great

Lakes Fugitive Task Force found a firearm in her home was indeed truthful. While it may be relevant that the officers used information of the firearm to potentially induce her to grant them permission to reenter her home, information regarding the discovery of the firearm does not appear to have created a false, imminent threat of danger that coerced her consent similar to the circumstances in *Hernandez-Pineda* or in *Pagan-Gonzalez. See Hernandez-Pineda*, 2025 WL 2438683 at *5 (citing *Pagan-Gonzalez*, 919 F.3d at 591−92). Accordingly, it appears to this Court that not only was Shipp's consent voluntary, but that the heart of Walker's argument, at its core, concerns whether her consent was sufficiently attenuated from the unlawful protective sweep.

Here, because the search following the unlawful protective sweep was justified based on the consent of Shipp, the issue is whether the voluntary consent was obtained by exploitation of the preceding Fourth Amendment violation, or instead by means sufficiently distinguishable to be purged of the primary taint. *Davis*, 44 F.4th at 689 (citing *Brown*, 422 U.S. at 603; *Robles-Ortega*, 348 F.3d at 681). "To decide whether voluntary consent was sufficiently attenuated, we use a mutli-factor balancing test," which includes "(1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, in particular, (3) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown* 422 U.S. 603−604).

As to the first factor, the temporal proximity between the unlawful conduct and the consent, while courts have "observed that several minutes may be insufficient

to purge the taint of a constitutional violation," time span alone is not dispositive. *Corder*, 2023 WL 2539030 at *11. The Court "must consider the context and whether it helps the passage of time attenuate the underlying violation. *Id.* at *12 (citing *Conrad*, 673 F.3d at 733−34; *Rawlings v. Kentucky*, 448 U.S. 98, 107−108 (1980)). For example, in *Corder*, the district court found that while only a handful of minutes passed between the unlawful law enforcement agent's conduct and the subsequent search, the defendant had not been in custody but instead was in the comfort of his own home, able to reflect upon his circumstances. *Id.* In other circumstances, courts have concluded that periods as long as two hours may or may not be sufficient to taint the purge of a constitutional violation. *See Conrad*, 673 F.3d at 733 (collecting cases).

The passage of time, or the first factor, must also be considered in light of the second factor, the presence of intervening circumstances. *See id.* (citing *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003). In other words, time span alone is not dispositive but must also be considered in the context of the factual circumstances and whether it helps the passage of time attenuate the underlying violation. *Corder*, 2023 WL 2539030 at *11 (citing *Conrad*, 673 F.3d at 733−34; *Rawlings*, 448 U.S. 107−08). Intervening circumstances may attenuate the initial unlawful conduct by severing the causal connection between the violation and the discovery of the subsequent evidence. *Conrad*, 673 F.3d at 734 (citing *Reed*, 349 F.3d at 464). "Some cases finding this factor present have focused on the presence of a non-custodial voluntary consent as an independent intervening event, so long as that consent was neither obtained immediately after an illegal entry, nor obtained following an illegal

stop, detention, or arrest." *Id.* (citing *United States v. Liss*, 103 F.3d 617, 621−22 (7th

Cir. 1997); *Robles-Ortega*, 348 F.3d 679, 683 (7th Cir. 2003); *United States v. Jerez*,

108 F.3d 684, 695 & n. 13 (7th Cir. 1997)) (quotation modified).

      In *Davis*, a case originally from this Court and factually similar to the case at

bar involving the same Great Lakes Fugitive Task Force, the Seventh Circuit found

that the first two factors of the attenuation analysis favored attenuation. There,

officers with the Great Lakes Fugitive Task Force executed a state court-issued

warrant for the arrest of Defendant Paige Davis at the front door of his residence.

*Davis*, 44 F.4th at 687. Davis was arrested just outside the front door of his residence

as he was opening the door and stepping outside to walk his dog. *Id.* While being

arrested, Davis advised officers that children were in the house; officers subsequently

entered the home to conduct a sweep of areas where a person might be hiding. *Id.*

While inside, officers found a child and a teenager, and additionally observed a .22

caliber rifle standing upright in plain view in an open bedroom closet. *Id.* Forty-five

minutes after the sweep concluded, while officers were still on the premises,

Antionette Ewing-Jimerson, who also lived at the residence with Davis and who

owned the home, arrived. *Id.* The officers obtained oral and written consent of Ewing-

Jimerson to search the home, and she acknowledged that she had been advised of her

rights pertaining to the search. *Id.* Ewing-Jimerson spoke with officers during the

search and volunteered information, including where Davis slept and her

relationship to him. *Id.*

      On appeal, Defendant Davis argued that, while Ewing-Jimerson had authority

to consent to the search of her home and even if her consent was given voluntarily, her consent was tainted because it was the product of an initial, unlawful entry (the sweep during which the firearm was purportedly observed in plain view). *Id.* The Seventh Circuit thus analyzed whether the government could sufficiently show that the illegal entry did not taint the consent given for the subsequent search. *Id.* at 688–89. The Court first noted that the forty-five minutes which passed between the initial entry and Ewing-Jimerson's voluntary consent was sufficient to support attenuation. *Id.* (citing *United States v. Pineda-Buenaventura*, 622 F.4th 761, 776 (7th Cir. 2010). Second, the Court observed that Ewing-Jimerson was absent from the scene during the initial entry and arrived long after the initial search, which was a clear intervening circumstance severing a causal connection between an illegal search and any subsequent consent. *Id.* (citing *Robles-Ortega*, 348 F.3d at 682). The Court further reasoned, in this regard, that while police had been present at the scene at the time Ewing-Jimerson arrived, the mere presence of officers outside the home was not enough to find that the initial unlawful entry tainted her consent. *Id.* (citing *Valencia*, 913 F.2d at 382).

Viewing the facts of this case in light of the foregoing, while the first factor is not entirely conclusive, the second factor and the context of the circumstances supports attenuation. Based on the facts as recounted by both St. Clair County Sheriff's Department Investigator Xavier Blackburn and ATF Special Agent Zachary Green in their respective police reports, the chronology of events appears fairly straightforward and is not in dispute; however, the total amount of time that passed

is entirely unclear. (*See* Doc. 25, Ex. 1; Doc. 29, Ex. 2). It is established that Walker purportedly arrived at the Short Street Property the night before around 11:30 PM or 12:00 AM, and that police concluded their interview with Shipp and Paulette at around 10:00 AM on October 28, 2025. (*See* Doc. 29, Ex. 3). However, the time between the search and Shipp and Paulette's arrival to the Short Street Property is not available to this Court. The context surrounding the timeframe at issue, however, is more conclusive and favors attenuation. Similarly to Ewing-Jimerson in the *Davis* case, Shipp was not at home or present for the initial unlawful protective sweep when it occurred; rather, when she arrived home, officers had concluded their initial intrusion into her home and were no longer inside. *See* 44 F.4th at 687, 689; (Doc. 25, Ex. 1; Doc. 29, Ex. 2). Thus, this factor slightly favors attenuation. *Id.* at 689 (citing *Pineda-Buenaventura*, 622 F.4th at 776).

The presence of intervening circumstances also favors attenuation. *Id.* (citing *Robles-Ortega*, 348 F.3d at 682). As established by the Seventh Circuit, the presence of non-custodial voluntary consent may operate as an independent intervening event where that consent was not obtained immediately after illegal entry nor obtained following an illegal arrest or detention. *Conrad*, 673 F.3d at 734 (citing *Liss*, 103 F.3d at 621−22; *Robles-Ortega*, 348 F.3d at 683; *Jerez*, 108 F.3d at 695 & n.13). Again, similarly to Ewing-Jimerson in *Davis*, Shipp was absent from the scene during the initial entry and arrived after that unlawful search, which here, too, operates as an intervening circumstance. *Davis*, 44 F.4th at 689 (citing *Robles-Ortega*, 348 F.3d at 682). While police were present when Shipp arrived, as in *Davis*, the presence of

officers outside Shipp's home, on its own, is not enough to find that the unlawful protective sweep tainted her consent. *Id.* (citing *Valencia*, 913 F.2d at 382). The fact that Shipp was not present but instead arrived only after the first unlawful search, coupled with the fact she voluntarily consented to the search of her home, favor attenuation.

The third factor, the purpose and flagrancy of the official misconduct, is considered the most important factor because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct. *Conrad*, 673 F.3d at 733; *see Green*, 111 F.3d at 532. The exclusionary rule is employed to ensure that the proper incentives are in place for law enforcement officers to deter intentional misconduct that was patently unconstitutional; in other words, the exclusionary rule is not used where suppression would do nothing to deter police misconduct. *Id.* (citing *Davis v. United States*, 564 U.S. 229, 232 (2011); *Herring v. United States*, 555 U.S. 135, 143 (2009)). "[A]ctions undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence" do not support attenuation and instead support suppression *Id.* (citing *Reed*, 349 F.3d at 465).

In *Davis*, the Seventh Circuit concluded that this third factor, the purpose and flagrancy of the police misconduct, also favored attenuation. Defendant Davis argued that the misconduct committed by the officers was the decision to initially enter the home without a warrant. *Id.* at 690. The Seventh Circuit found that, here, the United States had met its burden to show, by a preponderance of the evidence, that the

officers had "good faith reasons to go into the home and conduct a limited sweep for
individuals who might cause harm to the officers or to themselves." *Id*. The search
was limited to areas where persons might be hiding, and officers did not search any
enclosed areas such as drawers or cabinets. *Id*. Officers were only looking for
individuals who could harm the officers who were located just outside of the home or
could harm themselves if left alone in the home. *Id*. Based on the facts, the Seventh
Circuit concluded that Ewing-Jimerson's voluntary consent was sufficiently tainted
by the initial unlawful entry such that it provided a basis for the subsequent search
of the home. *Id*.

In contrast to the *Davis* Court's holding that officers conducted a lawful limited
protective sweep of Ewing-Jimerson's home, here, the Seventh Circuit explicitly
found that the Great Lakes Fugitive Task Force's initial warrantless entry into the
home was unreasonable and exceeded the scope of the Fourth Amendment. (Doc. 66,
Ex. 1, p. 10); *Walker*, 143 F.4th at 898. The Circuit Court concluded that the officers
exceeded the scope of a protective sweep by lifting a mattress where they had no
reasonable articulable basis for concluding a person posing a threat could be hiding.
(Doc. 66, Ex. 1, p. 10); *Walker*, 143 F.4th at 898−99. Hence, unlike in *Davis*, where
the officers' good faith basis for entering the home initially supported finding
attenuation, the absence of that good faith here on the part of the officers when
conducting the unlawful protective sweep supports finding that Shipp's consent was
not obtained by means sufficiently attenuated from the unlawful search.

Moreover, here, this Court finds that the officers' obtaining Shipp's consent to

search her home was also not done in good faith but rather operated as the next step in their investigation in order to continue their search for contraband in Shipp's home. *See Conrad*, 673 F.3d at 733 (citing *Davis*, 564 U.S. at 232; *Herring*, 555 U.S. at 143). At some point after the arrest of Defendant Walker, officers communicated with Shipp and called her to the scene such that she arrived home *while they were still on the scene.* (Doc. 25, Ex. 1; Doc. 29, Ex. 2). Rather than having to leave the scene and return at a later time, or rather than swearing out an affidavit and obtaining a judge's signature on a judicial search warrant, instead, with Shipp present on the scene to give consent, their work could continue without significant pause or interruption. Moreover, it is too much of a logical stretch for this Court to conclude that her consent was obtained by means sufficiently distinguishable from the illegal protective sweep. Here, officers specifically informed Shipp of the fruits of that search at the same time they sought permission to re-enter her home. Shipp maintains, by submission of her affidavit, that the officers' action of informing her of the discovery of the firearm in her grandson's bedroom impacted her decision to give the Great Lakes Fugitive Task Force permission to search her home; she also states they asked her to "conduct a *further* search of my home." (Doc. 25, Ex. 2 (emphasis added). She knew that officers had already been in her home and knew what they had already found while in there. The Government, having the burden here to establish attenuation, did not attempt to rebut this evidence or call Shipp to the witness stand to challenge her position or credibility as a witness. The purpose and flagrancy of the misconduct clearly cuts against attenuation here.

Simply stated, on the whole, while indeed Shipp's consent was voluntarily given in writing after she was informed of her right to refuse, this Court must conclude that the consent she gave was clearly the product of their first unlawful search, such that it was in fact tainted by the unlawful protective sweep. The purpose of the exclusionary rule is to discourage police misconduct, particularly where, as this Court has found here, was undertaken in an effort to benefit the police at the expense of Walker's protected rights. *See Green*, 111 F.3d at 523. Thus, this Court concludes suppression is warranted here.

### CONCLUSION

In light of the foregoing reasons, Defendant Richard Walker's Motion to Suppress (Doc. 24) is **GRANTED**. Defendant Walker's Motion to Bar Waived Argument on Remand (Doc. 72) is **DENIED as moot**.

**IT IS SO ORDERED.**

**DATED: November 17, 2025**


<u>**s/ *Stephen P. McGlynn***</u>
**STEPHEN P. McGLYNN**
**U.S. District Judge**